IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

MARKIM SUMMERS,

                Plaintiff,

    v.

COMMISSIONER CHARLES RAMSEY,
et al.,

                Defendants.

CIVIL ACTION
NO.  13-6644

## OPINION

**Slomsky, J.**                                            **December 12, 2016**

## I.    INTRODUCTION

On June 29, 2013, while high on PCP and naked, Plaintiff Markim Summers jumped onto a police patrol car and used his bare fists to pummel the glass windshield.[1]  Summers struck the windshield twice.  He then attempted to strike the windshield a third time.  On his third attempt, Officer Thomas O'Brien, then seated in the driver's seat, discharged his firearm.  Officer O'Brien fired his gun upwards through the windshield.  Two bullets entered Plaintiff's midsection, one to his torso and the other to an arm.

---

[1] PCP is short for phencyclidine, "a controlled substance which causes hallucinations and serious psychological disturbances."  See Guilbeau v. W.W. Henry Co., 85 F.3d 1149, 1164 n.41 (5th Cir. 1996) (citing R. Sloane, THE SLOANE DORLAND ANNOTATED MEDICAL LEGAL DICTIONARY 585 (1987)).  Due to the violent, bizarre, unpredictable behaviors associated with PCP use, PCP-intoxicated persons are at increased risk of inadvertent injury, self-injurious behavior and death.  Moreover, there is a significant risk that incidents between a PCP-intoxicated person and police officers will result in injury or death to the police officer due to the unpredictable behavior associated with PCP intoxication.  (Doc. No. 32-4 at ¶ V.)  In the Philadelphia area, PCP is commonly impregnated in a marijuana or tobacco cigarette.  (Id.)  The cigarette is dipped or immersed into the PCP liquid.  This results in the PCP-soaked cigarette which is referred to as "wet."  (Id.)

Officer Thomas O'Brien is one of the named Defendants in this case.  Plaintiff has also brought suit against Officers Daniel Levitt and Daniel Williams.  Plaintiff alleges that they also participated in the events that led to his injuries.  In addition, Plaintiff has brought claims against the Philadelphia Police Department, the City of Philadelphia, and the Philadelphia Police Commissioner Charles H. Ramsey.

In an attempt to hold as many Defendants as possible responsible for his injuries, Plaintiff alleged in his Complaint sixteen causes of action.  Plaintiff has since voluntarily requested dismissal of nine claims.  The claims that remain are alleged in Counts I-IV, VII, X, and XI. Counts I-IV and VII allege the commission of Pennsylvania state law torts.  In Counts I and II, alleging assault and battery respectively, only Officer O'Brien is named as a Defendant.  In Counts III and IV, also alleging assault and battery respectively, only Officer Levitt is named as a Defendant.  In Count VII, a negligence claim, the City of Philadelphia is the only named defendant.  In addition, there are two federal claims remaining.  Count X alleges an excessive force claim in violation of the Fourteenth Amendment under 42 U.S.C. § 1983 against all named Defendants.  Count XI alleges a substantive due process claim under 42 U.S.C. § 1983 against all named Defendants.

## II.     Instant Action

Plaintiff Markim Summers, also known as Mark Johnson ("Plaintiff"), brings this civil rights lawsuit pursuant to 42 U.S.C. § 1983 and the supplemental jurisdiction of the federal court over related state law claims.  Summers alleges that his civil rights were violated on July 29,

2013, when he was shot twice by Officer Thomas O'Brien ("Officer O'Brien").  Before the Court are all Defendants' Motion for Summary Judgment.[2]  (Doc. No. 32.)

The instant action was initially filed in the Philadelphia Court of Common Pleas on October 18, 2013.  Defendants Officer Levitt, Commissioner Ramsey, and the City of Philadelphia removed the case to this Court on November 15, 2013, on the basis of federal question jurisdiction.  (Doc. No. 1.)  On July 16, 2014, Plaintiff filed a Second Amended Complaint against Defendants alleging sixteen causes of action.  (Doc. No. 12.)  On July 17, 2014 Defendants filed an Answer to the Second Amended Complaint.  (Doc. No. 13.)

On March 7, 2016, Defendants filed a Motion for Summary Judgment.  (Doc. No. 32.)  On March 29, 2016, Plaintiff filed a Response.  (Doc. No. 33.)  On April 4, 2016, Defendants filed a reply.  (Doc. No. 34.)  Additionally, the Court has received letters from both parties instructing the Court on recent Third Circuit decisions.  As noted, the remaining Counts allege the following causes of action:

(1) <u>Count I</u>:  Personal injury claim of civil assault against Officer O'Brien;

(2) <u>Count II</u>:  Personal injury claim of civil battery against Officer O'Brien;

(3) <u>Count III</u>:  Personal injury claim of civil assault against Officer Levitt;

(4) <u>Count IV</u>:  Personal injury claim of civil battery against Officer Levitt;

(5) <u>Count VII</u>:  Personal Injury claim of negligence against the City of Philadelphia;

(6) <u>Count X</u>:  Section 1983 claim for damages for violation of Plaintiff's constitutional rights
   for failure to train, supervise, and discipline officers for violations of Directives 10 and

---

[2] Plaintiff has requested that Counts V, VI, VIII, IX, XII, XIII, XIV, XV, and XVI be dismissed. (Doc. No. 33 at 1.)  Plaintiff made this request after discovery was unable to produce sufficient evidence to continue with these claims.  (<u>Id.</u>)  The Court will grant Plaintiff's request. Consequently, the summary judgment analysis only concerns the remaining claims, which are alleged in Counts I, II, III, IV, VII, X, and XI.  (<u>Id.</u>)

22 against Officers O'Brien, Williams, and Levitt, the City of Philadelphia, the Philadelphia Police Department, and Commissioner Charles Ramsey;

(7) <u>Count XI</u>:  Section 1983 claim of excessive force against Officers O'Brien, Williams, and Levitt as well as the City of Philadelphia, the Philadelphia Police Department, and Commissioner Charles Ramsey.

For reasons that follow, the Court will grant Defendant's Motion for Summary Judgment (Doc. No. 32) on the remaining Counts in the Amended Complaint (Doc. No. 12).

## III.   FACTUAL BACKGROUND

During the early morning hours of July 29, 2013, around 5:14 a.m., while Officer Daniel Levitt was patrolling alone in a marked patrol car, he saw a naked, African American male in a Rite Aid parking lot who was visibly agitated and throwing either a newspaper dispenser or trashcan.[3]  (Doc. No. 32-3 at 28:14-18, 32:17 – 33:13; Ex. Levitt-1.)  That individual was later

---

[3] The factual background is recited in the light most favorable to Plaintiff as the non-moving party.  In this case, Plaintiff is unable to remember events on the day in question.  Plaintiff stated in his deposition that he has a "real choppy" recollection of the events.  (Doc. No. 33, Ex. I, 20:24).  Plaintiff remembers drinking alcohol and beer and using marijuana that evening.  (<u>Id.</u> at 23:3-10).  It is unclear if Plaintiff knowingly smoked "wet marijuana."  (<u>Id.</u> at 24:1-4: 17-20).  Plaintiff previously received drug treatment at Gaudenzia for PCP use.  (<u>Id.</u> at 28:1-20).  Plaintiff remembers leaving his mother's apartment naked after having an altercation with his sister.  (<u>Id.</u> at 24:23-24; 25:1-3; 33:6-10).  Plaintiff does not remember walking to Rite Aid naked, being at 22nd and Allegheny and lying on the ground, encountering the police, throwing a newspaper box, or being shot.  (<u>Id.</u> at 34:2-19.)  In fact, Plaintiff's first memory following the altercation with his sister was seeing his mother in the hospital after he was shot.  (<u>Id.</u> at 34:20-24.)

Because of Plaintiff's failure to recall certain events at the scene on June 29, 2013, the Court will set forth the facts contained in the depositions of Officers O'Brien, Levitt, and Williams, as well as the transcripts of Lieutenant David Van and Tracy Pendleton, and the transcript of the guilty plea entered by Plaintiff.  Plaintiff pled guilty to assaulting and recklessly endangering Officer O'Brien.  The Court will also take facts from Dr. David Vearrier's report.  Dr. Vearrier lists his background and qualifications as follows:

. . . an Assistant Professor of Emergency Medicine at Drexel University College of Medicine. I am core faculty for the Emergency Medicine Residency at Drexel University College of Medicine/Hahnemann University Hospital, an American Council for Graduate Medical Education accredited training program. As such I regularly provide didactic lectures and clinical instruction for doctors who are training to become board-certified in emergency medicine. I am board-certified in emergency medicine by the American Board of Emergency Medicine, which is an American Board of Medical Specialties member board.

I am the Fellowship Director for the medical Toxicology Fellowship at Drexel University College of Medicine/Hahnemann University Hospital. As such, I oversee the training of physicians seeking sub-specialty board certification in medical toxicology. I provide didactic lectures and clinical instruction to these physicians-in-training and evaluate the progression of their training and overall competency. I am board-certified in medical toxicology, a medical sub-specialty recognized by the American Board of Medical Specialties. In addition, I am board-certified in Occupational Medicine, a medical sub-specialty recognized by the American Board of Medical Specialties.

I am a Certified Medical Review Officer by the Medical Review Officer Certification Council. As such I have extensive knowledge on biological testing for drugs of abuse, including phencyclidine, and interpretation of forensic tests. I have performed thousands of medical reviews for the United States Department of Transportation employment-related drug testing as well as non-Department of Transportation employment drug testing.

I teach emergency medicine and medical toxicology to interns, emergency medicine residents, toxicology fellows and emergency medicine attending physicians on a daily and weekly basis. I am the Clerkship Director for the Medical Toxicology Clerkship at Drexel University College of Medicine. In addition to teaching and research responsibilities, I am engaged in the active clinical practice of emergency medicine and medical toxicology. I am an attending physician on the staff of the following hospitals: Roxborough Memorial Hospital, St. Joseph's Hospital, and Hahnemann University Hospital. I am an attending medical toxicologist on the staff of the following hospitals in the greater Philadelphia area where I have privileges to evaluate and treat patients: Hahnemann University Hospital, Fitzgerald Mercy Hospital, Mercy Hospital of Philadelphia, and the Children's Hospital of Philadelphia. In addition, I serve as a medical toxicology consultant for the Philadelphia Poison Control Center.

I regularly provide didactic lectures and clinical instruction on drugs of abuse, forensic drug testing, and the physiological and toxicological manifestations of phencyclidine intoxication. Over the course of my medical career I have treated thousands of patients with intentional and inadvertent self-injury as a result of

identified as Plaintiff.  Plaintiff Summers has described himself as being six foot-one inch tall and weighing approximately one hundred and seventy pounds, with the ability to lift one hundred pounds or so.  (Doc. No. 33, Ex. 1 at 15:1-3; 42:1-2.)  Officer Levitt called for backup, requesting a taser trained officer, based on his previous experiences with people appearing to be under the influence of PCP.  (Doc. No. 32-5 41:6-22.)

On July 29, 2013, Officers O'Brien and Williams were on patrol separately.  They came together after Officer Levitt's radio call for backup assistance.  (Doc. No. 32-6 at 43:11-15.)  The officers made their way to Officer Levitt's location.  Officer Williams was trained on the use of tasers.  (Id. at 47:1-20; Doc. No. at 32-9 19:5-12.)

Before their arrival, Plaintiff began to walk northbound into traffic on 22nd Street.[4] (Doc. No. 32-3 at 37:21-38:3.)  Tracy Pendleton, a Southeastern Pennsylvania Transportation Authority ("SEPTA") bus driver, approached from the southbound lane on 22nd Street.  (Doc. No. 32-5 at 23:3-15, 16:16-21.)   He observed Plaintiff being followed by a police cruiser. Pendleton stated that Plaintiff was walking in the middle of the street, flailing his arms and arguing to himself.  (Id. at 16:19-20, 38:16-22.)

Next, Plaintiff laid down in the middle of 22nd Street, before the intersection of 22nd Street and Westmoreland Street.  Plaintiff was partially raised up by his elbows, as if he were watching television.[5]    (Id. at 17:1-5.)  Plaintiff did not threaten the bus, the driver, or its

---

phencyclidine intoxication.  I have authored several-peer reviewed papers and one book chapter on or related to drugs of abuse, including phencyclidine.

(See Doc. No. 32-4 at 2-3.)

[4] Officer Levitt testified that 22nd Street is not considered a major thoroughfare.  It is a two-lane highway which runs north and south.  (Doc. No. at 32-3 44:3-6.)

[5] Westmoreland Street is a one-way street.  (Doc. No. at 32-6 36:6-10.)

passengers at any point that morning.  Pendleton did not observe Plaintiff pick up anything in the street as the bus passed him.  (Id. at 20:24-21:1-5.)

While Plaintiff was on the ground, Officer Levitt remained in his car and made a call over his police radio that a male had stopped a bus.[6]  (Doc. No. 32-3 at 43:10-18.)  Eventually, Plaintiff stood up and walked towards the northeast corner of 22nd Street and Westmoreland Streets.  (Doc. No. 32-3 at 44:5-19.)  Officer Levitt testified that Plaintiff then picked up two rocks and threw them onto the ground.  (Id.; Doc. No. 32-5 at 40:7-15)  Next, Plaintiff walked east on Westmoreland Street.  (Id. at 45:1-3.)

Once Plaintiff began walking Officer Levitt attempted to block him from moving further because he feared that Plaintiff would hurt himself or others.  To secure the road, Officer Levitt passed Plaintiff on the left and made a wide, right U-turn down 21st Street.  (Doc. No. 32-3 at 45:5-7; 46:13-47:9-10; Doc. No. 32-6 at 51:24-52:3.)  At this point, Officer Thomas O'Brien arrived at the scene and proceeded down Westmoreland Street.  Officer O'Brien then made a U-turn and pulled up on the driver side of Officer Levitt.  (Doc. No. 32-6 at 54:4-15.)  Officer Williams arrived shortly thereafter and faced eastbound on Westmoreland.  Officer Williams was directly across from Officer Levitt and Officer O'Brien.  (Doc. No. 32-9 at 22:1-24:12.)  The three patrol cars were stopped and separated by about twelve feet.  Officer Williams was across from the other officers and in between their cars stood Plaintiff.  He was not touching either car and was still several feet away from each car.  (Id. at 25:14- 26:10.)

---

[6] According to Pendleton, Plaintiff did not lay down directly in front of the bus.  Pendleton stated he could have continued driving the bus, without touching Plaintiff.  (Doc. No. 32-5 at 39:19-40:2.)  Pendleton said that he did not continue driving out of fear that Plaintiff would roll into his lane.  (Doc. No. 32-5 at 16:22-17:5.)

Next, Plaintiff walked towards Officer O'Brien and Officer Levitt's cars.  (Doc. No. 32-7 at 59:17-24.)  Plaintiff was sweating profusely and gesturing up towards the sky.  He appeared to be speaking to someone.  (Id. at 63:5-64:16.)  He also made rapid, jerking-type movements and appeared to be in a drug-induced state.  (Id. at 65:12-24.)  Officer O'Brien described Plaintiff as appearing to be in his own world.  (Id. at 67:1-7)  Based on his experience, Officer O'Brien believed Plaintiff was on PCP.  (Id.)

Subsequently, Plaintiff approached Officer Levitt's car and in a "gingerly slow movement," tried to reach into the driver side window "like a baby."  (Id. at 60:22-61:5.)  Officer Levitt then immediately placed his car in reverse and rolled up his window.  (Doc. No. 32-3 at 54:1-55:4.)  In response, Plaintiff turned his body toward Officer O'Brien's passenger window.  At this point, his prior childish nature suddenly turned aggressive.  (Doc. No. 32-7 at 73:5-11, 77:1-3.)  Officer Williams observed Plaintiff yelling something inaudible moments before he made contact with Officer O'Brien's vehicle.  (Doc. No. 32-9 at 30:14-23.)  Thereafter, Plaintiff jumped onto Officer O'Brien's patrol car.  (Id.)

Next Plaintiff, using his bare fist, punched the windshield of Officer O'Brien's car.  The force shook the entire car.  (Id. at 76:6-9, 78:22-23.)  The first punch was close to Officer O'Brien's driver side window and damaged the windshield.  (Id. at 78:15-18, 80:1-9.)  At this time, Officer O'Brien said that he reached toward his steering column to put his car into reverse.  (Id. at 82:1-23.)  Before Officer O'Brien could do so, Plaintiff threw a second punch at the windshield causing it to explode glass dust into Officer O'Brien's face.  (Id.)  The second punch made a hole in the windshield.  (Id.  at 83:21-23.)  At this point, Officer O'Brien had glass powder on his face and a man standing over him, threatening his safety.  (Id. at 83:7-8.)  Plaintiff did not listen to any of the officer's requests to stop punching the patrol car.

Thereafter, Plaintiff readied his swing a third time.  (Id. at 83:23-24.)  Officer O'Brien, fearing for his life and safety, removed his gun from his holster and fired two shots upward aiming in between Plaintiff's belly button and collar bone area.[7]  (Id. at 84:12-16, 85:5-17, 88:22-89:8.)  Officer O'Brien said that he fired the shots because he was focused on his "survival.  [Plaintiff was] coming in [his] windshield and [Plaintiff was] not going to have a chance to do to [him] what [Plaintiff] did to [his] windshield."  (Id. at 84:14-16.)  Officer O'Brien, in his deposition, described his thoughts before the shooting as follows:

Q:  Intention wise, when you are shooting what is the intention?

A:  To stop the threat.

Q:  Shoot to kill or shoot to get him off the car or shoot for some other reason?

A:  I'm shooting to stop the threat.  That is where we're instructed to shoot, in the center mass.  My intention is not to kill anybody.

* * *

Q:  You told me that there was not at that point an option to back up.  Am I correct at that point?

A:  I don't know what you mean by that statement.  I mean, you're talking about a hair of a millisecond here.

Q:  I am.  You're right.  Any thoughts --

A: I made a conscious decision at that moment based upon my level of fear.

Q:  So this is going to sound like a dumb question, but I guess I have to ask.  What was the level of fear?  What are you thinking?

---

[7] This area is described as a person's "center mass."  (Doc. No. 32-7 at 88:22- 89:8.)

A:  I'm thinking that the damage that he did to that windshield, I mean, we're

talking fear of my life at this point.

(Id. at 89:9-16, 92:11-93:1.)

After Officer O'Brien fired the two shots, he immediately got out of his car.  (Id. at 90:20-23.)  At this point the driver side door was the barrier between Officer O'Brien and Plaintiff.  (Id. at 91:6-8.)  Next, Plaintiff, without reaction, began walking eastbound down Westmoreland Street towards 20th Street for about one block.  (Id. at 98:7-14; Doc. No. 32-9 36:20-24, 38:4-8.)  Officers O'Brien, Levitt and Williams followed Plaintiff on foot until he eventually collapsed on Woodstock Street.  (Id. at 100:2-23)  Officer O'Brien did not know if his shots had hit Plaintiff while he followed him on foot.  When Plaintiff turned backwards and faced the officers long enough, Officer O'Brien noticed a bullet wound in his chest.  (Id. at 102:6-16.)  Before or after Plaintiff collapsed, Officer O'Brien went to his radio and notified headquarters that he had discharged his weapon and had fired two shots.  (Id. at 103:5-15.)

Next, one officer called for rescue.  Medic 4B arrived and put Plaintiff on a stretcher to transport him to Temple University Hospital.  (Doc. No. 32-9 at 42:1-14.)  At the hospital, he was treated for two gunshot wounds—one to his right chest and one that grazed his elbow. Officer Williams followed the vehicle to the hospital because Plaintiff was now considered to be in custody.  (Id.)

Officer Levitt stayed at the scene to write up the incident report.  Officer O'Brien could not file the incident report because he had discharged his weapon.  (Id. at 42:16-24.)  Officer O'Brien was transported to Internal Affairs by a sergeant after his ammunition was counted. (Doc. No. 32-7 at 107:22-24; Doc. No. 32-3 at 72:4-9.)

10

Officer O'Brien was investigated by the Philadelphia Police Department ("PPD") Shooting Team.[8]  The Shooting Team is made up of a group of investigators within the Internal Affairs Division.  (Doc. No. 32-14 at 5:1-6:24)  It works in conjunction with PPD detectives, the PPD firearms investigation unit, and the PPD crime scene unit when responding to an incident involving an officer discharging a weapon.  (Id.)  The team investigates the incident and the discharge together.  (Id.)  This incident was investigated by Lieutenant David Van ("Lieutenant Van") of the Shooting Team.  (Id.)

Historically, the Shooting Team conducts an investigation to determine if any infractions of the PPD directives occurred when the officer discharged his firearm.[9]  (Id. at 14:1-3.)  Once the Shooting Team investigator has obtained all relevant evidence and interviewed the discharging officer, the investigator prepares a memorandum for the Police Commissioner.  (Id. at 18:5-19:9.)  This memorandum is reviewed by the investigator's captain, an inspector, a chief inspector, and finally, the Use of Force Review Board.  (Id.)  If an officer is charged, he would appear before the Police Board of Inquiry Charging Unit ("PBI") for review.  (Doc. No. 32-15.) Except as otherwise stated in Appendix "A" of Directive 79, only the Police Commissioner has the authority to suspend, demote or dismiss a police officer.[10]  (Id.)

---

[8] In addition to the Shooting Team investigation, the District Attorney's office also investigates an officer-involved shooting to determine if the officer should be charged for discharging a weapon.  (Id. at 13:19-14:1.)  The investigations were conducted simultaneously.

[9] The Philadelphia Police Department has various "directives" that officers must follow.  They are the rules that govern officers and serve as a roadmap for how officers must handle certain situations.

[10] Directive 79, Appendix A: Command Level Discipline.  The policy is as follows:

1. POLICY

   A. It is the policy of this Department to authorize district/unit Commanding Officers to take consistent disciplinary action against all sworn employees for infractions of the Department's Disciplinary Code. Such infractions covered under this Appendix are limited to those with penalties ranging from a reprimand to a suspension not to exceed five (5) days.

. . .

   B. The district/unit Commanding Officer is authorized to offer the offending officer a penalty consistent with his/her actions and after taking into consideration the officer's work history, commendations, prior discipline, etc.

   C. Command Level Discipline is a tool available to a Commanding Officer. A Commanding Officer is never obligated to offer Command Level Discipline to an officer.

   D. Should the officer agree to the penalty by the commander, he/she shall waive their right to arbitration and the disposition will be final. The disposition is not subject to further command disapproval or adjustment.

   E. The officer may decline the commander's offer of discipline and request to have the case heard by the Police Board of Inquiry.

   F. Command Level Discipline applies to sworn members of the Police Department only.

2. PROCEDURE

   A. The Commanding Officer of personnel accused of violations of departmental regulations shall conduct and submit a complete and thorough investigation to the Police Board of Inquiry Charging Unit. A cover memorandum requesting disciplinary action will be attached to the package.

      1. The investigation shall include, but not be limited to: completed reports, statements from civilian or police complainants and police or civilian witnesses, statements of the accused, DAR's, Daily Complaint Summary(s), signed court notices, KTNQ printouts, Radio Logs, Patrol Logs[,] etc.

   B. In those cases where the maximum Disciplinary Code recommendation is five (5) days or less, the Commanding Officer of the charged officer shall have the discretion to offer a settlement.

12

C.  In calculating the potential penalty, multiple charges that have an aggregate potential penalty greater than five days are still eligible under this directive of the individual charges each do not exceed five (5) days.

. . .

D.  The Commanding Officer of the charged officer is expected to make a fair and appropriate offer based on the allegations and other factors including the officer's work history, commendations, productivity measurements (arrests, summons, calls for service answered, prior discipline history, etc.).

E.  If the officer accepts the recommended penalty, he/she has agreed to waive their rights to arbitration.  The disposition is not subject to further command disapproval or adjustment.

F.  The charged officer is also free to decline the offer conveyed by their commander and request to have the case heard by the Police Board of Inquiry. At this point, the Commanding Officer shall document the offer on the Command Level Discipline Agreement and have the [package hand delivered to the PBI Charging Unit.

G.  The Department Advocate shall also have the authority to settle this same category of cases.  He/she shall give strong consideration to all relevant factors, including the original offer, when determining any settlement with the charged employee.

H.  In situations where a Fraternal Order of Police (FOP) representative has not signed the agreement, the Commanding Officer initiating the settlement will strike paragraph #4 of the agreement.

I.  When settling this category of cases, the officer's Commanding Officer and the Department Advocate shall also have the authority to impose the penalty in terms of vacation days in lieu of suspension days.

J.  Only the district/unit Commanding Officer will sign the Command Level Agreement. In their absence, only the covering Commander will sign.

K.  The Command Legal Agreement will be returned directly to the PBI Charging Unit as part of the complete 75-18 package.

BY COMMAND OF THE POLICE COMMISSIONER

Directive 79, Appendix A: Command Level Discipline.  (original emphasis omitted.)

A "DAR" is the Daily Attendance Report.  See Philadelphia Police Department Directive 11.5 (1)(A).  A KTNQ printout is made using the KTNQ system which records absence, lateness, and excuses of police officers.  See Philadelphia Police Department Directive 6.2: Appendix A.

On April 15, 2014, Officer O'Brien was charged by the Use of Force Review Board with violating Article VI, Disobedience, Section 6-§008-10: Discharging, using, displaying or improper handling of a firearm while not in accordance with Departmental Policy.  (Doc. No. 32-17; Doc. No. 32-18.)  On February 27, 2015, the PBI found Officer O'Brien not guilty of any charge.  PBI reasoned that "the amount of force . . . exhibited by Officer O'Brien during his encounter . . . did not exceed the amount of force necessary to stop the threat of serious bodily injury to the officer."  (Doc. No. 32-18.)  Commissioner Ramsey agreed with the PBI's findings that Officer O'Brien was not guilty and he was not dismissed from the Police Department.  (Id.)

## IV.    SUMMARY JUDGMENT STANDARD

Granting summary judgment is an extraordinary remedy.   Summary judgment is appropriate if "the pleadings, depositions, answers to interrogatories, admissions, and affidavits show there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law."  Montgomery Cnty., Pa. v. MERSCORP Inc., 795 F.3d 372, 376 (3d. Cir. 2015); see also Fed. R. Civ. P. 56(a).  A disputed issue is "genuine" only if there is a sufficient evidentiary basis on which a reasonable jury could find for the non-moving party.  Kaucher v. Cnty. of Bucks, 455 F.3d 418, 423 (3d Cir. 2006) (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)).  For a fact to be considered "material," it "must have the potential to alter the outcome of the case."  Favata v. Seidel, 511 F. App'x 155, 158 (3d. Cir. 2013).  Once the proponent of summary judgment "points to evidence demonstrating no issue of material fact exists, the non-moving party has the duty to set forth specific facts showing that a genuine issue of material fact exists and that a reasonable factfinder could rule in its favor."  Id. (quoting Azur v. Chase Bank, USA, Nat'l Ass'n, 601 F.3d 212, 216 (3d. Cir. 2010) (internal quotation marks omitted)).

14

In deciding a motion for summary judgment, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." Id. (quoting Chambers ex rel. Chambers v. Sch. Dist. of Phila. Bd. of Educ., 587 F.3d 176, 181 (3d. Cir. 2009) (quotation omitted)).  The Court's task is not to resolve disputed issues of fact, but to determine whether there exists any factual issue to be tried.  Anderson, 477 U.S. at 247-249.  Whenever a factual issue arises which cannot be resolved without a credibility determination, at this stage the Court must credit the non-moving party's evidence over that presented by the moving party.  Id. at 255.  If there is no factual issue, and if only one reasonable conclusion could arise from the record regarding the potential outcome under the governing law, summary judgment must be awarded in favor of the moving party.  Id. at 250.

The non-moving party may not resist a properly filed motion for summary judgment by relying solely on the unsupported conclusory allegations contained in pleadings.  Anderson, 477 U.S. at 248. The non-movant must go beyond the pleadings and affidavits and designate specific facts showing that there is a genuine issue for trial. Id. "[A] party opposing summary judgment must do more than just rest upon mere allegations, general denials, or vague statements."  Super Fresh Food Mkts., Inc. v. United Food & Commercial Workers Local Union 1776, 249 F. Supp. 2d 546, 551 (E.D. Pa. 2003).  In ruling on a defendant's motion for summary judgment,  Plaintiff must show more than a mere scintilla of evidence.  Anderson, 477 U.S. at 252.  Enough evidence must exist such that a jury could reasonably find for plaintiff.  Id. The plaintiff cannot merely rely upon assertions or speculation.  Gans v. Mundy, 762 F.2d 338, 341 (3d. Cir. 1985).  If the evidence is merely colorable or is not sufficiently probative, summary judgment may be granted. Bouriez v. Carnegie Mellon Univ., 585 F.3d 765, 771 (3d. Cir. 2009).  Additionally, "the unverified representations of counsel in a brief are not a proper part of the record for

consideration on a motion for summary judgment." <u>Prince v. Sun Shipbuilding & Dry Dock Corp.</u>, 86 F.R.D. 106, 107 (E.D. Pa. 1980).

Where a non-moving party bears the burden of proof at trial, the moving party's burden may be "'discharged by 'showing'. . . that there is an absence of evidence to support the non-moving party's case.'" <u>Bouriez</u>, 585 F.3d at 771 (quoting <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 325 (1986)). If the moving party carries this burden, "the burden shifts to the non-moving party to point to sufficient cognizable evidence to create material issues of fact such that a reasonable jury could find in its favor." <u>Bouriez</u>, 585 F.3d at 771 (internal citation and quotation marks omitted).

## V.     ANALYSIS

Plaintiff's claims against Defendants are based in part on alleged violations under 42 U.S.C. § 1983. This Section provides in pertinent part:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

<u>Id.</u>

Pursuant to Section 1983, civil liability may be imposed upon any person who, acting under the color of state law, subjects any person to the deprivation of any right, privilege, or immunity secured by the Constitution and the laws of the United States of America. 42 U.S.C. § 1983. Section 1983 does not create any new substantive rights, but rather creates a cause of action for violation of a federal right created elsewhere. <u>See</u> <u>Doe v. Delie</u>, 257 F.3d 309, 314 (3d. Cir. 2001). Thus, "[t]he first step in evaluating a [S]ection 1983 claim is to 'identify the exact contours of the underlying right said to have been violated' and to determine 'whether the

plaintiff has alleged a deprivation of a constitutional right at all.'" Chainey v. Street, 523 F.3d 200, 219 (3d. Cir. 2008) (quoting Nicini v. Morra, 212 F.3d 798, 806 (3d. Cir. 2000)).

### a.  All Claims Against the Philadelphia Police Department Will Be Dismissed

First, in Counts X and XI, Plaintiff seeks to recover for his injuries damages from the Philadelphia Police Department ("PPD").  All claims against the Philadelphia Police Department alleged in Counts X and XI must be dismissed because the PPD has no independent legal existence apart from the City of Philadelphia.  See Regalbuto v. City of Philadelphia, 937 F. Supp. 374, 377 (E.D. Pa. 1995).  As such, the Philadelphia Police Department cannot be sued as a matter of law.  Id.  Therefore, Defendants' Motion for Summary Judgment on Counts X and XI regarding the Philadelphia Police Department will be granted.

### b.  All Claims Against Commissioner Charles Ramsey Will Be Dismissed

Plaintiff has failed to produce any evidence that Commissioner Ramsey was personally involved in the events that took place on the morning of June 29, 2013.  Plaintiffs in this Circuit must prove that a defendant in a civil rights action had personal involvement in committing the alleged violation.  See Rode v. Dellarciprete, 845 F.2d 1195 (3d Cir. 1988); Agresta v. City of Philadelphia, 694 F. Supp. 117, 121-22 (E.D. Pa. 1988); Eppers v. Dragovich, No. 95-76731996 WL 420830, at *4 (E.D. Pa. Jul. 24, 1996) (finding that defendants in civil rights actions must have "personal involvement" in the alleged wrongs).  Any liability of an individual officer must "be based on his own acts or omissions, not those of [other] individual officers." Agresta, 801 F. Supp. at 1468 (citing Monell v. Dep't of Soc. Servs. of the City of New York, 436 U.S. 658, 693)); Jett v. Dallas Indep. Sch. Dist., 491 U.S. 701, 735 (1989)); Eppers v. Dragovich No. 95-7673 1996 WL 420830, at *4 (E.D. Pa. July 24, 1996).

Here, Plaintiff has failed to allege any facts that suggest Commissioner Ramsey was personally involved in the alleged failure to train, supervise, or discipline officers for violations

of Directives 10 and 22, in violation of his constitutional rights (Count X) or the Fourth Amendment (Count XI).

To overcome this shortfall, Plaintiff argues that Commissioner Ramsey is vicariously liable for the actions of the police officers in his command.  But as courts have instructed in Eppers, a defendant must have personally directed or have actual knowledge and acquiesced in order to be liable.  See Eppers, No. 95-7673 1996 WL 420830, at *4, ("Personal involvement may be shown through allegations of personal direction or of actual knowledge and acquiescence.  The plaintiff's allegation of participation or actual knowledge, however, must be made with appropriate particularity. citing Rode v. Dellarciprete, 845 F.2d 1195, 1207 (3d Cir.1988); Hampton v. Holmesburg Prison Officials, 546 F.2d 1077 1083 (3d Cir.1976).")) There can be no vicarious liability claims within a § 1983 action.  See Reaves v. Vaugh, No. 00-2786 2001 WL 936392, at *4 (E.D. Pa., Aug. 10, 2001) ("However, the mere fact that a named defendant is in a supervisory position is insufficient to establish liability under Section 1983, as the doctrines of vicarious liability or respondeat superior do not apply to Section 1983 claims." (citing C.H. ex rel. Z.H. v. Oliva, 226 F.3d 198, 201-02 (3d Cir. 2000) (citations omitted)).)

Reaves involved the search of a cell and a claim for excessive force by corrections officers at SCI Graterford.  Reaves at *1.  The Court in Reaves granted the Motion for Summary Judgment in favor of the Officers after finding no genuine issues of material fact "and that the factual record [did] not support Reaves' claim that the defendants used excessive force."  Id. at *1.  In Reaves, the Court held:

> Because personal involvement is required in order to state a valid claim for deprivation of a constitutional right under [S]ection 1983, *see Rode v. Dellarciprete,* 845 F.2d 1195, 1207 (3d Cir. 1988), the factual record does not support an excessive force violation against Vaugh. The factual record demonstrates that Vaugh did not personally search Reaves' cell, did not use any force against Reaves, and did not personally acquiesce in Dombrosky and

18

> Przybylowski's alleged wrongful conduct. Therefore, Vaugh cannot be found liable for violating Reaves' Eighth Amendment rights.   Reaves apparently attempts to avoid this conclusion by stating that Vaugh's liability stems from the fact that he is the superintendent of SCI Graterford and, therefore, is in charge of the correctional officers in the facility. However, the mere fact that a named defendant is in a supervisory position is insufficient to establish liability under Section 1983, as the doctrines of vicarious liability or respondeat superior do not apply to Section 1983 claims.   *See C.H. ex rel. Z.H. v. Oliva,* 226 F.3d 198, 201-02 (3d Cir. 2000) (citations omitted).

Reaves v. Vaugh, No. 00-2786 2001 WL 936392, at *4 (E.D. Pa., Aug. 10, 2001.)

Here, Plaintiff has failed to plead any facts that would suggest Commissioner Ramsey had personal involvement with the events that led to Plaintiff's harm.  In fact, Plaintiff has failed to allege any facts other than those suggesting Commissioner Ramsey holds a supervisory position over the Officers who are also Defendants in this case.  As the Court found in Reaves, this is an insufficient basis on which to base liability for violation of a constitutional right.

In the alternative Plaintiff argues that within the Philadelphia Police Department, there is a widespread custom or practice of using excessive force when making arrests.  However, Plaintiff has failed to produce any evidence that Commissioner Ramsey was aware of this alleged widespread practice or custom.  Moreover, Plaintiff has failed to set forth any facts that show Commissioner Ramsey was deliberately indifferent to the constitutional rights of citizens.[11]

In Montgomery v. De Simone, the Third Circuit found that a failure to train police officers,

> can only form the basis for section 1983 municipal liability if the plaintiff can show both contemporaneous knowledge of the offending incident or a prior pattern of similar incidents and circumstances under the supervisor's actions or inaction could be found to have communicated a message of approval to the offending subordinate.

---

[11] Plaintiff concedes deficiency of his allegations about Commissioner Ramsey in his Response to Defendants' Motion for Summary Judgment.  (Doc. No.32-2 at 15, Doc. No. 33 at 10.)

159 F.3d 120, 127 (3d Cir. 1998) (citing <u>Bonenberger v. Plymouth Township</u>, 132 F.3d 20, 25 (3d Cir. 1997)).   In <u>Montgomery</u>, Plaintiff argued that she was unlawfully pulled over and arrested for drunk driving and that she was harassed by her arresting officer.  The district court in that case granted the defendant's motion for summary judgment in part, finding that the plaintiff's allegations did not rise to the level of deliberate indifference as required for Section 1983 liability.  <u>Montgomery v. De Simone,</u> 159 F.3d 120 (3d Cir. 1998).

Here, Plaintiff has failed to provide any evidence of contemporaneous knowledge of the offending incident or a prior pattern of similar incidents and circumstances under which Commissioner Ramsey's actions or inactions could be found to have communicated a message of approval to his subordinates.  In fact, there is no evidence that Commissioner Ramsey was aware of the Defendant Officers' encounter with Plaintiff on the morning of June 29, 2013.  He became aware after the events took place and only during the internal police department investigation.  Likewise, there is no evidence of record that suggests Commissioner Ramsey was on notice that the Defendant Officers had previously used excessive force while making an arrest.[12]

Additionally, Plaintiff has failed to plead any facts that suggest a widespread custom or practice of Philadelphia police officers using deadly force in violation of citizens' rights when making arrests.   In fact, the record clearly establishes that Philadelphia police officers are required to go through training on the use of deadly force throughout their career.  (<u>See</u> Doc. No. 32-1 at 15:1-16:258.)  Additionally, in Directives 10 and 22, Philadelphia police officers are instructed of the consequences if he/she uses deadly force or if he/she fails to stop another officer

---

[12] As Defendants point out in their submissions, there is no evidence in the record which shows the Defendant Officers ever being disciplined for using excessive force when making an arrest. (<u>See</u> Doc. No. 32-1 at 15.)

from using excessive force when making an arrest.[13]   As such, the record establishes the absence of an unconstitutional policy or custom of failing to train and supervise police officers on the use of excessive force and of failing to enforce Directives 10 and 22.

_____

[13] Philadelphia Police Department Directive 10.1: Use of Force—Involving the Discharge of Firearms states in part as follows:

1. POLICY

    A. It is the policy of the Philadelphia Police Department, that officers hold the highest regard for the sanctity of human life, dignity, and liberty of all persons.  The application of deadly force is a measure to be employed only in the most extreme circumstances and all lesser means of force have failed or could not be reasonably employed.

    B. The most serious act in which a police officer can engage during the course of their official duties is the use of deadly force.  The authority to carry and use firearms in the course of public services is an immense power, which comes with great responsibility.

    C. Police Officers shall not use deadly force against another person, unless they have an objectively reasonable belief that they must protect themselves or another person from death or serious bodily injury.  Further, an officer is not justified in using deadly force at any point in time when there is no longer an objectively reasonably belief that the suspect is dangerous, even if deadly force would have been justified at an earlier point in time.

    D. When feasible under the circumstances, police officers will give the suspect a verbal warning before using deadly force.

    E. Police officers using their professional judgment should not discharge their weapon when doing so might unnecessarily endanger innocent people.

    F. Subjects may be physically or mentally incapable of responding to police commands due to a variety of circumstances including but not limited to alcohol or drugs, mental impairment, medical conditions, or language and cultural barriers.  Officers should be mindful of this when making use of force decisions.

    G. After using deadly force, officers shall immediately render the appropriate medical aid and request further medical assistance for the suspect and any other injured individuals when necessary and safe to do so and will not be delayed to await the arrival of medical assistance.

H.  Officers who witness inappropriate or excessive force have a duty to report such violations to a supervisor and Internal Affairs.

2.  DEFINITIONS

A.  Objectively Reasonable: Is a Fourth Amendment standard whereby an officer's belief that they must protect themselves or others from death or serious bodily injury is compared and weighted against what a reasonable or rational officer would have believed under similar circumstances.  This determination is made by reviewing all relevant facts and circumstances of each particular case, including, but not limited to, (1) the severity of the crime at issue, (2) whether the suspects poses an immediate threat to the safety of the officers or others, (3) whether the suspect is actively resisting arrest or attempting to evade arrest by flight.

> NOTE: Resisting arrest or flight alone would not justify the use of deadly force.  While the US Supreme Court identifies three (3) factors that should be evaluated in determining whether an officer's use of force was objectively reasonably, this list was not intended to be all inclusive.  The TOTALITY OF THE CIRCUMSTANCES that led an officer to believe force was needed is critical.  Other factors such as whether an individual is violent, the possibility that the individual is armed, and the number of persons with whom an officer must contend with at the time are all relevant factors to consider.  INDIVIDUAL FACTORS alone would not give a reasonable belief that deadly force is necessary.

B.  Resistance:  Is an act by an individual that opposes an officer's lawful commands.  There are two types of resistance.

1.  Active Resistance: Is defined as the use of physical force to defy an officer's lawful arrest or attempt to gain control of a situation that requires police action.

2.  Passive Resistance: Is defying an officer's lawful order without the use of physical force.  Behaviors may include not moving, going limp, locing of arms or tightening of the body.

3.  USE OF FORCE

A.  GOAL: To always attempt to de-escalate any situation where force may become necessary.  In the event force because unavoidable, to use only the

22

As a result, Defendants' Motion for Summary Judgment seeking dismissal of the claims against Commissioner Charles Ramsey in Count X and Count XI will be granted.

---

minimal amount of force necessary to overcome an immediate threat or to effectuate an arrest.

The amount of force, the continued use of any force, and the type of police equipment utilized, all depends upon the situation being faced by the officer.  However, once the threat has been overcome, or a subject is secured in custody; it is an officer's responsibility to de-escalate and immediately address any injuries the suspect may have sustained.

4.  SPECIFIC PROHIBITIONS

A.  Police officers shall not draw their firearms unless they reasonably believe an immediate threat for serious bodily injury or death to themselves or another person exists.

Philadelphia Police Department Directive 10.1: Use of Force—Involving the Discharge of Firearms.  (original emphasis omitted)

In the Philadelphia Police Department Directive 22—Use of Force states in part as follows:

II.     POLICY

A.  The primary duty of all police officers is to preserve human life.  Only the minimal amount of force necessary to protect life or to effect an arrest should be used by an officer.  Excessive force and/or gratuitous use of any force will not be tolerated.  Officers should exercise all safe and reasonable means of control and containment, using only the amount of force necessary to overcome resistance.  The application of force by a police officer should be guided by principles found in the "Force Continuum" which are:

*Officer presence
*Verbal commands
*Physical control
*Less than lethal force
*Deadly force

(original emphasis omitted.)

### c.   The <u>Monell</u> Claim Against the City of Philadelphia Will Be Dismissed

In <u>Monell</u>, the Supreme Court held that municipal entities are subject to Section 1983 liability only under limited circumstances.   436 U.S. 658, 690 (1978).   As the <u>Monell</u> court stated:

> . . . [C]ongress did not intend municipalities to be held liable unless action pursuant to official municipal policy of some nature caused a constitutional tort. In particular, we conclude that a municipality cannot be held liable <u>solely</u> because it employs a tortfeasor—or, in other words, a municipality cannot be held liable under § 1983 on a <u>respondeat superior</u> theory.[14]

<u>Id.</u> at 691.   (emphasis in original).   In this case, Plaintiff concedes that the City of Philadelphia is a defendant solely on the basis of respondeat superior.   <u>Id.</u>   Plaintiff states in his Response (Doc. No. 33 at 9):

> Given the evidence present at the time, plaintiff is only asserting a claim against the City of Philadelphia as the employer of the individual defendant(s) on the theory of respondeat superior.  As indicated in plaintiff's attached Order, the other claims based upon <u>Monell</u> can be dismissed in this matter.

As noted, a <u>Monell</u> claim must allege more than liability on the basis of respondeat superior. Because Plaintiff fails to do so, his claim against the City of Philadelphia will be dismissed.

Even if Plaintiff had not conceded that the claim against the City of Philadelphia was based on the theory of respondeat superior under, his claims are not sufficient to survive Defendants' Motion for Summary Judgment.   Plaintiff alleges violations under Section 1983 against the City of Philadelphia for failure to train, supervise, and discipline officers (Count X) and for violation of his substantive due process rights (Count XI).   A plaintiff may bring a Section 1983 claim for damages against a local government entity only when the alleged

---

[14] Respondeat Superior means "Let the master answer."   <u>Black's Law Dictionary</u> (10th ed. 2014).  The theory suggests that a "master" is liable in certain cases for the wrongful acts of his servants and is a principal of those of his agent.  Here, it means that the City of Philadelphia is responsible for the police officers it employs and the actions that the officers take as individuals.

unlawful action was taken pursuant to a municipal policy or custom, not when the action was a random act of an official.  Monell v. Dep't of Soc. Servs. of City of New York, 438 U.S. 658, 690-91 (1978).

> [T]he action that is alleged to be unconstitutional [must] implement [sic] or execute [sic] a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers . . . [or] pursuant to governmental 'custom' even though such a custom has not received formal approval through the body's official decision making channels.

Id.; see also Williams v. Borough of W. Chester, Pa., 891 F.2d 458, 467 (3d Cir. 1989) (dismissing a suit against a city for the acts of one of its police officers).  Further, under Monell, a municipality can be held liable when execution of a government policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible for under Section 1983.  See Johnson v. City of Philadephia, 105 F. Supp. 3d 474, 482 (E.D. Pa. 2015) (citing Monell v. Dep't of Soc. Servs. of City of New York, 438 U.S. 658, 690-91 (1978)).

As the Supreme Court held in Connick v. Thompson:

> A municipality's culpability for a deprivation of rights is at its most tenuous where a claim turns on a failure to train.  See Oklahoma City v. Tuttle, 471 U.S. 808, 822-823, (1985) (plurality opinion) ("[A] 'policy' of 'inadequate training'" is "far more nebulous, and a good deal further removed from the constitutional violation, then was the policy in Monell").  To satisfy the statute, a municipality's failure to train its employees in a relevant respect must amount to "deliberate indifference to the rights of person with whom the [untrained employees] come into contact."  Canton, 489 U.S. at 388.  Only then "can such a shortcoming be properly thought of as a city 'policy or custom' that is actionable under § 1983.

> "'Deliberate indifference' is a stringent standard of fault requiring proof that a municipal actor disregarded a known or obvious consequence of his action." Bryan Cty., 520 U.S. at 410.  Thus, when city policymakers are on actual or constructive notice that a particular omission in their training program causes city employees to violate citizens' constitutional rights, the city may be deemed deliberately indifferent if the policymakers choose to retain that program.  Id. at 407.  This city's "policy of inaction" in light of notice that its program will cause constitutional violations "is the functional equivalent of a decision by the city

itself to violate the Constitution." <u>Canton</u>, 489 U.S. at 395. (O'Connor, J., concurring in part and dissenting in part). A less stringent standard of fault for a failure-to-train claim "would result in de facto respondeat superior liability on municipalities…" <u>Id.</u> at 392; <u>see also</u> <u>Pembaur</u>, <u>supra</u>, at 483. ("[M]unicipal liability under § 1983 attaches where—and only where—a deliberate choice to follow a course of action is made from among various alternatives by [the relevant] officials…").

<u>Connick v. Thompson</u>, 563 U.S. 51, 61 (2011).

Here, as in <u>Connick</u>, Plaintiff has failed to plead facts that suggest the City or its employees acted with deliberate indifference in regard to Plaintiff's failure to train claim. <u>Connick</u> instructs that plaintiffs are required to plead facts with particularity to show a deliberate choice by an official to follow a course of action that would amount to a failure to train on how to avoid the use of excessive force. Because Plaintiff has not shown that the City of Philadelphia or any named Defendants engaged in such conduct, his Section 1983 claim fails. As a result, Plaintiff's federal claims against the City of Philadelphia will be dismissed.

Moreover, the Supreme Court has held that a municipality cannot be held liable on a <u>Monell</u> claim where there has been no underlying rights violation under Section 1983. (<u>Johnson v. City of Philadelphia,</u> 105 F.Supp.3d 474, 482 (2015) (citing <u>City of Los Angeles v. Heller,</u> 475 U.S. 796, 799 (1986)). As noted by the Supreme Court in <u>Johnson</u>, if no underlying violation exists, a "Plaintiff cannot maintain a <u>Monell</u> claim against the city for its alleged failure to train and supervise its officers."[15] Therefore a plaintiff must have an underlying constitutional violation coupled with facts that meet the <u>Monell</u> standard in order to make out a sustainable claim. Because Plaintiff has failed to allege here an underlying constitutional violation or a

---

[15] The Supreme Court also cited <u>Kneipp v. Tedder,</u> where the Third Circuit found that because no "underlying constitutional violation [existed], plaintiff's 'failure to train' claim against the City would not stand" for a claim of damages under 42 U.S.C. § 1983. 95 F.3d 1199, 1212 n.26 (3d Cir. 1996).

policy or custom of a failure to train or supervise by the municipality, the City of Philadelphia

cannot be held liable for a <u>Monell</u> claim.  Plaintiff has failed to comply with the requirements of

<u>Monell</u>, and as such Defendants' Motion for Summary Judgment against the City of Philadelphia

in Count X and XI will be granted.

### d. Federal Law Claims Against Defendant O'Brien Will Be Dismissed (Counts X and XI)[16]

Officer O'Brien is the only Officer that Plaintiff had specific contact with.  In the Second

Amended Complaint, Plaintiff pled facts only against Officer O'Brien that show the use of

excessive force.  In considering the facts in the light most favorable to the Plaintiff, whether

Officer O'Brien was reasonable in his use of deadly force on the morning of June 29, 2013 will

be analyzed below. [17]

In <u>Johnson v. City of Philadelphia</u>, the District Court grappled with whether the

Plaintiff's Fourth Amendment rights were violated.  837 F. 3d 343 (3d Cir. 2016).  There. the

---

[16] Like the District Court in <u>Johnson,</u>

> Because I conclude that [O'Brien] did not violate [Summers'] Fourth Amendment rights in his use of deadly force, I need not address defendants' claims of qualified immunity.  But I note in passing that where 'plaintiff fails to make out a constitutional violation, the qualified immunity inquiry is at an end; the officer is entitled to qualified immunity."

105 F. Supp. 3d 474, 482 (quoting <u>Bennett v. Murphy,</u> 274 F.3d 133, 136 (3d Cir. 2002)).)  This Court therefore need not address qualified immunity claims asserted by the Defendants.

[17] A Section 1983 Claim is analyzed under the following standard:

> Section 1983 claims alleging a law enforcement official used excessive force [while] of making an arrest, investigatory stop, or other seizure . . . are properly analyzed under the Fourth Amendment's objective reasonableness standard rather than under a substantive due process standard.

<u>Boroff v. Lynn,</u> 643 Fed.Appx. 130, 132-133 (3d Cir. 2016) (citing <u>Graham v. Connor,</u> 490 U.S. 386, 388, 109 S.Ct. 1985, 104 L.Ed.2d 443 (1989) (internal quotations omitted.)

plaintiff was high on PCP, naked, yelling, and flailing his arms when an officer arrived on scene.

Johnson v. City of Philadelphia, 837 F. 3d 343 (3d Cir. 2016.)  The trial court explained that:

> The Fourth Amendment safeguards "[t]he right of the people to be secure in their persons . . . against unreasonable . . . seizures."  To prevail on a Fourth Amendment excessive-force claim, a plaintiff must show that a seizure occurred and that it was unreasonable under the circumstances.  There is no dispute that [law enforcement officers] "seized" when they shot him.  The question, instead, is whether the seizure was unreasonable.

Johnson v. City of Philadelphia, 105 F.Supp.3d 474 (2015) (quoting Lamont v. New Jersey, 637

F.3d 177, 182-183 (3d Cir. 2011) (internal citations omitted).

The Fourth Amendment "guarantees citizens the right 'to be secure in their persons . . .

against unreasonable . . . seizures of the person."  Graham v. Connor, 490 U.S. 386, 394 (1989).

The U.S. Supreme Court has held that the determination of "reasonableness" is made:

> from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight, [taking] into consideration that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation.

Johnson, 105 F.Supp.3d 474, 479 (2015) aff'd in Johnson v. City of Philadelphia, 837 F.3d 343

(3d Cir. 2016); Boroff v. Lynn, 643 Fed. App'x. 130, 133 (2016) (citing Graham v. Connor, 490

U.S. 396-97); see also Kopec v. Tate, 361 F.3d 772, 776-77 (3d Cir. 2003) ("when determining

the reasonableness of an officer's use of force, we consider whether the suspect poses an

immediate threat to the safety of the officer or others").  The Johnson trial court further stated:

> Indeed, the calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation.

Johnson, 105 F.Supp.3d 474, 479-80 (quoting Graham v. Connor, 490 U.S. 386, 396-97, 109

S.Ct. 1865, 104 L.Ed.2d 443 (1989)).  The District Court in Johnson found that the relevant

question at the summary judgment stage was therefore "whether plaintiff [had] adduced evidence of [officer's] unreasonableness in his use of force 'sufficient to permit a reasonable jury to return a verdict' for plaintiff." Johnson, 105 F.Supp.3d 474, 479-80 (quoting Roth v. Norfalco, LLC, 651 F.3d 367, 373 (3d Cir. 2011)).

The Third Circuit, on review of the District Court's decision granting summary judgment, in favor of the officer, affirmed the District Court's decision. The Third Circuit found that the officer did not violate the plaintiff's Fourth Amendment right by using deadly force before awaiting backup. In Johnson, the plaintiff was high on PCP, naked, yelling, and flailing his arms when the officer arrived on scene. Johnson v. City of Philadelphia, 837 F.3d 343 (3d Cir. 2016). The Court found that the officer did not violate the Plaintiff's rights because the Plaintiff was unresponsive to commands of the officer and the officer feared for his safety and the safety of those around him.

Specifically, in Johnson, the Third Circuit found that the Fourth Amendment does not require "officers encountering emotionally or mentally disturbed individuals . . . to passively endure a life-threatening physical assault, regardless of the assailant's mental state." Id. at 353. The Third Circuit further found that "[a] proper Fourth Amendment analysis requires us to assess not only the reasonableness of [the officer's] actions at the precise moment of the shooting, but the "totality of the circumstances" that lead up to the shooting. Id. at 350; see also Abraham, 183 F.3d at 292 (recognizing that "events prior to a seizure" should "be considered in analyzing the reasonableness of the seizure.")[18]

---

[18] In Johnson, the Third Circuit noted:

> There is no dispute that Officer Dempsey "seized" [Plaintiff] for Fourth Amendment purposes when he shot and killed him. The only question is whether Officer Dempsey's use of force was objectively reasonable under the

29

The Third Circuit in <u>Johnson</u> further found that if a reasonable jury were presented with this evidence they "could [not] find that a reasonable officer in Dempsey's position lacked good reason to believe that [Plaintiff] posed a significant threat of death or serious physical injury." <u>Johnson</u> at 349.  The court granted the motion for summary judgment because:

> In other words, no reasonable jury could find that Dempsey's actions were unreasonable under the circumstances, and since the use of force was not unreasonable, it did not amount to a violation of the Fourth Amendment.  The [Section] 1983 claim against Dempsey must fail at this stage, therefore because "the evidence is [in]sufficient to permit a reasonable jury to return a verdict" for the plaintiff.

<u>Johnson v. City of Philadelphia,</u> 105 F. Supp. 3d 474, 480 (E.D. Pa. 2015) (citing <u>Roth v. Norfalco, LLC,</u> 651 F.3d 367, 373 (3d Cir. 2011)).  The Court also found that an officer's "evil" intentions will not make a Fourth Amendment violation out of an objectively reasonable use of force, and good intentions cannot make an objectively unreasonable use of force constitutional. <u>Id.</u> (citing <u>Graham,</u> 490 U.S. 397).[19]  The only objective is what a reasonable officer in the same situation would have done.[20] <u>Id.</u>

---

circumstances.  At the summary judgment stage, once we identify the relevant facts and draw all inferences in the non-movant's favor, the reasonableness of an officer's actions is a pure question of law.

<u>Johnson v. City of Philadelphia,</u> 837 F.3d 343, 349 (3d Cir. 2016) (citing <u>Tennessee v. Garner,</u> 471 U.S. 1, 7 (1985); <u>Abraham v. Raso,</u> 183 F.3d 279, 290 (3d Cir. 1999) (quoting <u>Scott v. Henrich,</u> 39 F.3d 912, 915 (9th Cir. 1994); <u>Scott v. Harris,</u> 550 U.S. 372, 381 n.8 (2007).) (internal citations omitted.)  (internal quotations omitted.)

Here, the relevant question of whether Officer O'Brien acted reasonably when he used deadly force is a question of law.

[19] Cautioning future courts, the Third Circuit found:

> Given the extreme facts of this case, our opinion should not be misread to broadly immunize police officers from Fourth Amendment liability whenever a mentally disturbed person threatens an officer's physical safety.  Depending on the severity and immediacy of the threat and any potential risk to public safety posed by an

Here, Plaintiff alleges that Officer O'Brien violated his Fourth Amendment right to be free from unreasonable seizures by use of deadly force.  But no evidence in the record shows that a reasonable jury would rule in favor of Plaintiff.  It is undisputed that Plaintiff jumped on top of Officer O'Brien's patrol car, used his bare fists to punch holes in the windshield, and that under the circumstances Officer O'Brien justifiably feared for his safety and the safety of those around him.  From the facts viewed in the light most favorable to the Plaintiff, it is evident that Summers' actions on the morning of June 29, 2013 show that Officer O'Brien was reasonable in his belief that he was in fear of imminent harm or death.  Officer O'Brien was under no obligation to put himself or other civilians walking by in danger, by quickly maneuvering his patrol car in a way that would thwart Plaintiff's uncontrollable actions, despite the officer's desire to do so.  Further, Plaintiff did not cease his erratic behavior until several minutes after he

---

officer's delayed action, it may be appropriate for an officer to retreat or await backup when encountering a mentally disturbed individual.  It may also be appropriate for the officer to attempt to de-escalate an encounter to eliminate the need for force or to reduce the amount of force necessary to control an individual.  Nor should it be assumed that mentally disturbed persons are so inherently unpredictable that their reactions will always sever the chain of causation between an officer's initial actions and a subsequent use of force . . .

Whatever the Fourth Amendment requires of officers encountering emotionally or mentally disturbed individuals, it does not oblige an officer to passively endure a life-threatening physical assault, regardless of the assailant's mental state.

Johnson v. City of Philadelphia, No. 15-2346, 2016 WL 5030330, *7 (3d Cir. Sept. 20, 2016) (quoting Martin v. City of Broadview Heights, 712 F.3d 951, 958 (6th Cir. 2013); see also Deorle v. Rutherford, 272 F.3d 1272, 1282-83 (9th Cir. 2001) (holding that a civilian's mental status must be considered in determining the reasonableness of a use of force)).

[20] As the Third Circuit noted in Carswell v. Borough of Homestead, "we must never allow the theoretical, sanitized world of our imagination to replace the dangerous and complex world that policemen face every day.  What constitutes 'reasonable' action may seem quite different to someone facing a possible assailant than to someone analyzing the question at leisure." 381 F.3d 235, 244 (3d Cir. 2004.)

was shot twice.  Considering the totality of the circumstances, Defendants' Motion for Summary Judgment as to Officer O'Brien will be granted.

Presented with this evidence, no jury could find that a reasonable officer in O'Brien's position lacked "good reason to believe that [Plaintiff] pose[d] a significant threat of death or serious bodily injury."  Johnson, 105 F. Supp. 3d 474, 480 (quoting Lamont, 637 F.3d at 183). In sum, Plaintiff's lack of cooperation when asked to cease his actions coupled with his blows to the patrol car would lead a reasonable police officer to believe they were in fear of death or serious bodily injury.  As a result, the Motion for Summary Judgment will be granted as to Defendant Officer Thomas O'Brien on Counts X and XI.[21]

### e. Defendant Levitt Has Not Committed An Underlying Fourth Amendment Violation and Will Be Dismissed As A Defendant in Counts X and XI

Plaintiff also has not alleged any facts which show that Officer Levitt violated his Fourth Amendment right to be free from excessive force as a result of the events on the morning of July 29, 2013.  Plaintiff has failed to produce any evidence that Officer Levitt personally caused his injuries that day.

---

[21] Plaintiff merely states in his memorandum that:

> There is nothing in the facts which would lead a reasonable officer under these circumstances to believe that shooting a completely naked, unarmed man when there are three armed police officers present, two who are taser-equipped, would be a mistake.  Further, when there is a choice between simply backing up a vehicle into an open intersection or pulling out a firearm, which was previously holstered, to use deadly force, it is never a mistake to shoot someone at center mass instead of possibly colliding with another vehicle or a building.

(See Doc. No. 33 at 6.)

As the Third Circuit and the United States Supreme Court has instructed, "it [is] clearly established that an officer had the right to use deadly force if that officer harbored an objective and reasonable belief that a suspect presented an 'immediate threat' to his safety." See Tolan v. Cotton, 134 S.Ct. 1861, 1865 (2014) (citing Deville v. Marcantel, 567 F.3d 156, 167 (5th Cir. 2009));  Doe v. Delie, 257 F.3d 309, 312 (3d Cir. 2001) (quoting Good v. Dauphin Cty. Soc. Servs. for  Children & Youth, 891 F.2d 1087, 1092 (3d Cir. 1989)).

Again, the law in this Circuit is that a defendant in a civil rights action must have had personal involvement in committing the alleged violation.  See Rode v. Dellarciprete, 845 F.2d 1195 (3d Cir. 1988); Agresta v. City of Philadelphia, 694 F. Supp. 117, 121-122 (E.D. Pa. 1988); Eppers v. Dragovich, No. 95-76731996 WL 420830 at *4 (E.D. Pa. Jul. 24, 1996) (finding that defendants in civil rights actions must have "personal involvement" in the alleged wrongs).  Any liability of an individual officer must "be based on his own acts or omissions, not those of [other] individual officers."  See Agresta v. City of Philadelphia, 801 F. Supp. 1464, 1468 (E.D. Pa. 1992) (citing Monell v. Dep't of Soc. Servs. of City of New York, 436 U.S. 658, 693, 94, 98 S.Ct. 2019, 2037, (1978); Jett v. Dallas Indep. Sch. Dist., 491 U.S. 701, 735, 109 S.Ct. 2702, 2722, (1989)); Eppers v. Dragovich, No. 95-7673 1996 WL 420830, at *4 (E.D. Pa., July 24, 1996).

Here, Plaintiff merely alleged damages from the actions of Officer O'Brien and fails to allege any concrete facts as to Officer Levitt.  As a result, the federal law claims alleged in Counts X and XI against Officer Levitt will be dismissed in their entirety.

### f.   Defendant Williams Has Not Committed An Underlying Fourth Amendment Constitutional Violation and Will Be Dismissed As a Defendant in Counts X and XI

Plaintiff has failed to plead facts which show that Officer Williams violated his Fourth Amendment right to be free from excessive force.  Plaintiff has failed to produce any evidence that Officer Williams personally caused Plaintiff's injuries.  In fact, as noted, Plaintiff has only alleged an injury caused by Officer O'Brien's conduct.

As noted previously, a defendant in a civil rights action must have had personal involvement in committing the alleged violation.  See Rode v. Dellarciprete, 845 F.2d 1195 (3d Cir. 1988); Agresta v. City of Philadelphia, 694 F. Supp. 117, 121-122 (E.D. Pa. 1988); Eppers v. Dragovich, No. 95-76731996 WL 420830, at *4 (E.D. Pa. Jul. 24, 1996) (finding that

defendants in civil rights actions must have "personal involvement" in the alleged wrongs).  Any liability of an individual officer must "be based on his own acts or omissions, not those of [other] individual officers."  See Agresta v. City of Philadelphia, 801 F. Supp. 1464, 1468 (E.D. Pa. 1992) (citing Monell v. Dep't of Soc. Servs. of City of New York, 436 U.S. 658, 693, 94, 98 S.Ct. 2019, 2037, (1978)); Jett v. Dallas Indep. Sch. Dist., 491 U.S. 701, 735, (1989)); Eppers v. Dragovich, No. 95-7673 1996 WL 420830, at *4 (E.D. Pa. July 24, 1996).

Here, because Plaintiff only alleges damages stemming from the actions of Officer O'Brien and fails to allege any facts as to Officer Williams, the federal law claims in Counts X and XI, in which Officer Williams is named as a Defendant, will be dismissed in their entirety.

### g.  Defendants' Claims Under Heck v. Humphrey Warrant Summary Judgment

Defendants argue that Plaintiff is attempting to use this Section 1983 action as a means to challenge his Pennsylvania conviction that resulted from the events occurring on June 29, 2013. Defendants argue that this use of Section 1983 is not permissible and is barred by the holding in Heck v. Humphrey.  In Heck v. Humphrey, the Supreme Court held that a plaintiff cannot challenge the lawfulness of his or her criminal conviction under Section 1983.  512 U.S. 477, 486 (1994).  A plaintiff cannot attack the criminal conviction,

> by use of [a] [Section] 1983 claim without establishing that [their conviction] [was] reversed on direct appeal, expunged by executive order, declared invalid by a state tribunal authorized to make such a determination or called into question by the issuance of a writ of habeus corpus.

Maxwell v. Nutter, No. 11-7565 2015 WL 1312035, at *5 (E.D. Pa. Mar. 23, 2015) (citing Heck v. Humphrey, 512 U.S. 477, 486-87 (1994), where the Supreme Court found that a plaintiff could not challenge the lawfulness of his or her conviction through a Section 1983 claim). (internal quotations omitted).

34

Plaintiff was convicted in state court of assaulting and recklessly endangering Officer O'Brien resulting from the events that took place on June 29, 2013.  (Doc. No. 32-2 at ¶¶31-32.) As noted, Defendants argue that Plaintiff has filed this civil rights action in retaliation for his criminal conviction.  Defendants' claim that Plaintiff is not permitted under <u>Heck v. Humphrey</u>. Plaintiff argues, to the contrary, that he is not challenging the lawfulness of his conviction. Plaintiff states in his memorandum that he understands he "pled guilty to the assault and reckless endangerment of another person . . . and [knows] that the facts in his criminal hearing as alleged by the Commonwealth form the basis of [his] guilty plea."  (Doc. No. 33 at 6.)

But if Summers were to succeed on his claims of excessive force against Defendants, it would mean that his conviction was invalid.  In fact, a finding that Officer O'Brien used unjustified excessive force in violation of Plaintiff's Fourth Amendment rights would undermine his state court conviction and would imply that the state court erred in convicting Plaintiff of his offenses.  Moreover, Plaintiff has not produced any evidence that his convictions have been invalidated.   For all these reasons, his excessive force claim is not cognizable under the <u>Heck v. Humphrey</u> standard.

### h. Defendant Officers' Motion for Summary Judgment On Plaintiff's State Law Claims Will Be Granted (Counts I-IV)

Plaintiff's Pennsylvania state law claims of Civil Assault against Officer O'Brien (Count I), Civil Battery against Officer O'Brien (Count II), Civil Assault against Officer Levitt (Count III), Civil Battery against Officer Levitt (Count IV), and Negligence against the City of Philadelphia (Count VII) are barred by the Political Subdivision Tort Claims Act.[22]  As a result, the state common law claims must also be dismissed.

---

[22] The Plaintiff can recover against Defendants only in limited circumstances which are provided in the Act.  Section 8542 provides for a limited waiver of immunity in eight narrowly drawn exceptions, none of which apply here:

The Political Subdivision Tort Claims Act provides municipal employees acting within the scope of their employment immunity from suit for any damages on account of any injury to a person or property caused by any act of the local agency or an employee thereof or any other person.  42 PA. CONS. STAT. ANN. §§ 8541-8564.  A plaintiff can recover, however, if the City employee's actions causing the injury constitute a crime, actual fraud, actual malice, or willful misconduct.  Id. at § 8550.  To establish willful misconduct, it must be shown that the officer "intended to commit the intentional tort."  Pettit v. Namie, 931 A.2d 790, 801 (Pa. 2007).

Plaintiff argues that "willful misconduct" is established when a government employee desires to bring about the result that followed his conduct or is aware that it was substantially certain to follow.  (Doc. No. 33 at 9.)  This statement has "no validity in the context of a lawsuit based upon police conduct."  Renk v. City of Pittsburgh, 641 A.2d 289, 293 (Pa. 1994).  In Renk, the court explained:

> Assault is an intentional attempt by force to do an injury to the person of another, and a battery is committed whenever the violence menaced in an assault is actually done, though in ever so small a degree, upon the person."  *Cohen v. Lit Brothers,* 70 A.2d 419, 421 (Pa. 1950).  (Citation omitted.)  A police officer may

---

(1) operation of motor vehicles;
(2) care, custody, and control of personal property;
(3) care, custody, and control of real property;
(4) dangerous conditions of trees, traffic controls & street lighting;
(5) dangerous conditions of utility service facilities;
(6) dangerous conditions of streets;
(7) dangerous conditions of sidewalks;
(8) care , custody, and control of animals.

42 PA. CONS. STAT. ANN § 8542(b)(1)-(8).  These exceptions are to be construed narrowly as to protect the legislative intent to insulate local governments or political subdivisions from tort liability.  See, e.g., Lockwood v. City of Pittsburgh, 751 A.2d 1136 (Pa. 2000); Snyder v. Harmon, 562 A.2d 307 (Pa. 1989); Love v. City of Philadelphia, 543 A.2d 531 (Pa. 1988); Mascaro v. Youth Study Center, 523 A.2d 1118 (Pa. 1987).

use reasonable force to prevent interference with the exercise of his authority or the performance of his duty.

Id. at 294.

Here the officers' actions on the morning of June 29, 2013 were in self-defense.  Here no crime, fraud, actual malice, or willful misconduct has been shown.  In the case, In re City of Philadelphia Litigation, the Court defined willful misconduct as the intention to do what is known to be wrong, such as using excessive force in an arrest when the arresting officer knows the force used is excessive.  938 F. Supp. 1264, 1271 (E.D. Pa. 1996).

Here, in order to overcome the immunity, Plaintiff has the burden of proving Officers Levitt and O'Briens' conduct constituted willful misconduct and that the officers knowingly committed the acts anyway.  See 42 PA. CONS. STAT. ANN. § 8550; see also Renk v. City of Pittsburgh, 641 A.2d 289 (Pa. 1994); Fullard v. City of Philadelphia, No. 95-4949, 1996 WL 195388 at *5-6 (E.D. Pa. Apr. 22, 1996) (granting summary judgment in favor of the city officers because the plaintiffs could not produce sufficient evidence that the defendants knew that what they were doing was unlawful).

Here, as described below, Plaintiff has not proven that Officers O'Brien and Levitt knew that their conduct was unlawful and use of force was not warranted.  As a result, Summary Judgment will be granted on Counts I, II, III, and IV of the Amended Complaint (Doc. No. 12), and Officers O'Brien and Levitt will be dismissed as Defendants in this case.

### i. Defendant the City of Philadelphia's Motion for Summary Judgment on the Negligence Claim will be Granted

In Count VII, Plaintiff alleges the City of Philadelphia was negligent in causing his injuries.  As noted above, the tort liability of the City of Philadelphia is governed by the Political Tort Claims Act, which provides municipalities with general immunity from tort liability.  In this

case the City of Philadelphia has invoked its immunity under the statute, and no listed exception to that immunity has been proven by Plaintiff.

Furthermore, Count VII fails because the City did not negligently discharge a firearm against Plaintiff as alleged by Plaintiff in his Second Amended Complaint.  Finally, the firing of a police firearm under the circumstances here does not fall within any of the narrowly tailored eight exceptions to immunity.  Thus, the City's Motion for Summary Judgment as to Count VII will be granted.

**VI.    CONCLUSION**

For all of the foregoing reasons, the Defendants' Motion for Summary Judgment (Doc. No. 32) will be granted in its entirety.

An appropriate Order follows.